**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 1:21-CR-830** |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **ALFONSO MCDONALD,** | |
| **Defendant.** | **MEMORANDUM OPINION AND ORDER** |

**Procedural History**

This matter is before the Court upon Defendant Alfonso McDonald's ("Defendant") Motion to Suppress filed on November 1, 2022 ("Defendant's Motion"). (Doc. No. 21.) On November 8, 2022, the United States of America ("the Government") filed a Response in Opposition to Defendant's Motion ("the Government's Opposition"). On November 15, 2022, Defendant filed a Brief in Reply ("Defendant's Reply"). (Doc. No. 23.)

In Defendant's Motion, Defendant seeks suppression of the firearm found in Defendant's vehicle during a traffic stop that occurred on March 2, 2021. Defendant argued that the alleged excessive window tint on Defendant's vehicle and/or the "hand to hand" transaction investigating officers allegedly witnessed prior to the stop did not create probable cause to stop Defendant's vehicle. In response to the Government's assertion that it was "unclear if [Defendant] is alleging a lack of probable cause or an illegal search of his vehicle, or both," Defendant clarified that "[t]he justification for the stop is the issue in dispute that warrants an evidentiary hearing," and "[t]he material fact of why [Defendant] was stopped is the issue in dispute." (The Government's Opposition, Doc. No. 22, PageID # 70; Defendant's Reply, Doc. No. 23, PageID # 76.)

1

A hearing on Defendant's Motion was conducted on December 2, 2022, during which the Government called FBI TFO Det. Gumucio to testify regarding the events leading up to the traffic stop.  At the conclusion of the hearing, it was agreed that both parties would file supplemental briefs by January 9, 2023.  The Government filed its Supplemental Response in Opposition to Defendant's Motion ("the Government's First Supplemental Response") and Defendant filed his Post-Hearing Brief ("Defendant's First Supplemental Brief") on January 9, 2023.  (Doc. Nos. 27, 28.)

The Government's First Supplemental Response addressed the only assertion raised by Defendant in Defendant's Motion, i.e., that the "officers contrived the 'excessive window tint' justification for the stop.[1]  Stated succinctly, the Government argued that FBI TFO Det. Gumucio's testimony, based upon his training and experience only, and absent measuring the tint with a tint meter, that Defendant's vehicle, specifically the front driver and passenger windows and the front windshield, had excessive or legally impermissible window tint provided probable cause to conduct a stop of Defendant's vehicle.

In Defendant's First Supplemental Response, Defendant asserts that FBI TFO Det. Gumucio's testimony lacks credibility because:  1.) he did not use a tint meter to measure the tint of Defendant's windows, as is his typical practice and what he testified is the "best evidence" to demonstrate or determine whether a vehicle's tint exceeds what is permissible under the law; 2.) his testimony is irreconcilable with Sergeant McGrath's observations included in the police report, that Sergeant McGrath passed by and could see or witnessed the driver of the vehicle being stopped reach behind the passenger seat; and 3.) the body cam videos introduced as Defendant's Exhibit F demonstrated that Defendant's vehicle was not in violation of the excessive window tint laws.

---

[1] Defendant's Reply, Doc. No. 23, PageID # 76.

However, Defendant's First Supplemental Brief also included an argument not contemplated or asserted in Defendant's Motion or Defendant's Reply, i.e., that law enforcement illegally searched Defendant's vehicle prior to his invalid arrest.  (Doc. No. 28, PageID # 200.) Because of this new argument, the Court provided the Government with the opportunity to file a Second Supplemental Response, which it did on January 18, 2023.  (Doc. No. 29.)  Upon its review of the Government's Second Supplemental Response, the Court issued a Memorandum Opinion and Order on January 23, 2023 that set a status conference for January 25, 2023 to evaluate reopening the hearing to allow the parties to call any additional witness(es) they determined to be necessary to testify regarding the search of Defendant's vehicle.  (Doc. No. 30.)

The status conference was conducted on January 25, 2023, and for the reasons stated on the record, the Court determined that the hearing on Defendant's Motion should be reopened; and the reopened hearing was scheduled for March 10, 2023.  (Minutes of Proceedings, 1/25/2023.) On March 10, 2023, the Government filed a Motion to Continue the reopened hearing, due to the unavailability of the Government's witness.  (Doc. No. 35.)  The Court granted the motion and reset the hearing for April 6, 2023.  (Non-doc. Orders issued on 3/10/23.)  The reopened hearing had to be continued again because of the unavailability of Defendant, and it was finally conducted on April 10, 2023.  At the reopened hearing, only Detective Donnellan testified.  On April 19, 2023, Defendant's Post-Hearing Brief was filed ("Defendant's Second Supplemental Brief"), and on April 20, 2023, the Government's Supplemental Response in Opposition to Defendant's Motion ("the Government's Third Supplemental Response") was filed.  (Doc. Nos. 46, 47.)

**Factual Background**

During the December 2, 2022 hearing, Alex Gumucio testified that he is a detective with the Cleveland Division of Police, having been with the Cleveland Division of Police for a little

over 10 years, and is a narcotics detective and a task force officer with the FBI, having been so for approximately three years.  During his time with the Cleveland Division of Police, FBI TFO Det. Gumucio has enforced traffic laws of the City of Cleveland and the State of Ohio, and he has written approximately over a hundred or more traffic tickets.  Also, in his past experience in any capacity with the Cleveland Division of Police or as a task force officer, FBI TFO Det. Gumucio has investigated driver or passenger front window tint violations over a hundred times.  FBI TFO Det. Gumucio testified that based upon his training and experience, if he cannot see into the window to see the driver, he can make the traffic stop.  He is familiar with the City of Cleveland code on window tint, and the State of Ohio code for window tint, and is authorized to write, and has written tickets under both code sections.  According to FBI TFO Det. Gumucio, by statute, a driver's window must have a light transmittance of 50 percent, plus or minus three percent.

FBI TFO Det. Gumucio testified that typically he uses a tint meter to verify his initial opinion that a vehicle has excessive tint, and that use of the tint meter is the best evidence of excessive or impermissible window tint.  He did not use it to check the tint on the Hyundai at the time of the traffic stop that gave rise to the charge against Defendant, because he was preoccupied. FBI TFO Det. Gumucio denied that he accessed his tint meter and doubted any other officer would have accessed the tint meter in his bag without asking him, to determine that the tint was not impermissible, but intentionally failed to include the reading in his report.  He also testified that during his career as a police officer, on only one or two occasions early in his career did his use of the tint meter fail to support his initial opinion of excessive tint on a vehicle, and that his "law enforcement training is [absolutely] enough to know if a tint on a window is too dark to see inside of the vehicle on the driver side."[2]

---

[2] Doc. No. 25, PageID # 147, lines 19-24.

On March 2, 2021, FBI TFO Det. Gumucio was assigned to the gang impact unit that was part of the Operation Legend Task Force, which focused mostly on street violent crime, gang-affiliated crime, narcotics, and gun suppression, and members of that unit were patrolling the area of West 73rd and Clark and Denison, a high crime area, for drug activity mostly and gun suppression that goes along with it.  The unit was focusing on a local bar, the Ridge Café, and at about 11:00 p.m. Detective Moore, who was in an undercover capacity with the gang impact unit, reported seeing a hand-to-hand drug transaction between a person who had walked out of the bar and persons in a 2016 Hyundai.[3]  According to FBI TFO Det. Gumucio, there was no actual knowledge, or even probable cause that it was a drug transaction, and therefore the hand-to-hand transaction did not provide enough suspicion for him to be able to stop that vehicle, but it did provide enough or reasonable suspicion to keep an eye on that vehicle.  FBI TFO Det. Gumucio drove by the vehicle very quickly and noticed that it had what appeared to be heavy tint, but he was unsure at that time.

Other vehicles followed the 2016 Hyundai as it left the area of the Ridge Café, and other officers kept it under surveillance, and saw it stop at the Rite Shop Food Mart on West 73rd Street for 5 to 7 minutes during which the driver went into the store.[4]   According to FBI TFO Det. Gumucio, the officers who kept the Hyundai under surveillance while it was stopped at the store did not see anything that would have caused them alarm or suspicion at that time to stop or approach the vehicle while it was sitting in the parking lot of the store.  FBI TFO Det. Gumucio saw the Hyundai stopped at the store as he passed it heading south on West 73rd Street, after which

---

[3] Upon cross-examination, FBI TFO Det. Gumucio acknowledged that while during direct examination, he had testified that it was a hand-to-hand drug transaction, in his report associated with the incident, marked as Defendant's Exhibit A, he had written that it was a hand-to-hand transaction.

[4] Upon cross-examination, FBI TFO Det. Gumucio testified that a reference to the excessive tint of the Hyundai was communicated over the radio, but that he did not include in his report any other officer's observation of excessive window tint; he wrote "heavy window tint" in his report based upon his observations.

he, while listening to radio traffic, positioned his vehicle on a street off West 73rd St., facing westbound towards West 73rd St.  When he and his partner learned that the Hyundai was traveling southbound on West 73rd St., FBI TFO Det. Gumucio pulled his undercover vehicle onto West 73rd St., behind the Hyundai. At the point in time when the Hyundai traveled southbound on West 73rd St. and passed the street where FBI TFO Det. Gumucio's vehicle was stopped facing westbound towards West 73rd St., FBI TFO Det. Gumucio noticed that the tint was, in his opinion and based upon his training and experience, dark because he could not see into the driver's side. He explained that there were more streetlights on West 73rd St. than there were when he first drove quickly by the Hyundai near the Ridge Road Café, and he was able to view it under different lighting conditions.

After getting behind the Hyundai and traveling several blocks behind the Hyundai until it reached Denison Avenue and was about to turn left from West 73rd Street onto Denison, he activated his lights and sirens and pulled over the Hyundai.[5]  FBI TFO Det. Gumucio testified that he stopped the Hyundai based upon a combination of reasonable suspicion, i.e., the witnessing of the hand-to-hand transaction by experienced detectives, and probable cause, i.e., the excessive window tint.  FBI TFO Det. Gumucio confirmed through his review of his body camera video, introduced as Defendant's Exhibit D, that another law enforcement vehicle was situated in front of the Hyundai as he initiated the traffic stop.  Other officers were getting out of their vehicles and when he approached the driver's side of the Hyundai, FBI TFO Det. Gumucio could not see into the vehicle through the driver's window but he could see people moving around in the vehicle. When he was up close, FBI TFO Det. Gumucio reconfirmed his suspicion that the window tint was dark, and he asked the driver to roll down the window.  The driver rolled it down about a

---

[5] FBI TFO Det. Gumucio testified that part of the reason he followed the Hyundai for several blocks on West 73rd Street was maybe to see if there was another traffic infraction that he could use to justify the stop.

quarter, but not more than half of the way, and he asked the driver to roll it down more because law enforcement is concerned about firearms, of people doing harm to them, and they want to be able to see into the vehicle.  At that time, the car was still in drive and the keys were still in the ignition.

The Government marked as its Exhibit 1, a video that FBI TFO Det. Gumucio identified as footage from his body cam video showing the events of the traffic stop.  It demonstrated FBI TFO Det. Gumucio asking that the driver be pulled out of the vehicle, because as he testified, he has observed marijuana blunts hundreds of times, and there was an unburnt marijuana-like cigar or blunt in the center console that was in plain view.  Defendant confirmed to FBI ATF Det. Gumucio that he did not have a medical marijuana card.

According to FBI TFO Det. Gumucio, the driver also had a bottle of alcohol, and the body cam video demonstrated that Defendant claimed that the cap was on it, and FBI TFO Det. Gumucio agreed that it was not open; and Defendant was not cited for open container.  When FBI TFO Gumucio asked the driver to step out of the vehicle, it was a detention, and not an arrest.

Indeed, FBI TFO Det. Gumucio testified that it was at this point that he advised the driver that he was being detained, but he was not under arrest.  The driver was questioned outside the vehicle, and he was placed in handcuffs.  FBI TFO Det. Gumucio was questioning him when Detective Donnellan said that he had found something, and to read him his rights, and let him know he was under arrest.  According to FBI TFO Det. Gumucio, Detective Donnellan had seen something in the vehicle, specifically narcotics in plain view, when he opened the car door and started looking inside.  FBI TFO Det. Gumucio conducted a pat-down frisk for any type of weapons, and he found money in Defendant's pocket.  A search of the vehicle was completed and both narcotics and a pistol were removed from the Hyundai.

7

FBI TFO Det. Gumucio eventually learned that the name of the driver was Alfonso McDonald ("Defendant").  Defendant had a valid driver's license, and the Hyundai was registered to him.  FBI TFO Det. Gumucio's focus was on Defendant and other detectives completed parts of the investigation as it related to the Hyundai.

The Government introduced as its Exhibit 2a, a photograph that FBI TFO Det. Gumucio identified as depicting Defendant's vehicle, specifically a view of it from the driver's side that shows the marijuana blunt in the ashtray, and as demonstrating the pillar of the vehicle separating the driver's front and back windows, with the back window being completely black.  He confirmed that he did not make his assessment of the window tint based upon the back or rear window depicted in the right side of the photograph.

The Government introduced as its Exhibit 2b, what FBI TFO Det. Gumucio identified as a screen shot from his original body camera video depicting the Hyundai as he approached it with his flashlight, and the driver's window that he was looking through where the driver was sitting, with the window rolled up.  FBI TFO Det. Gumucio described the tinting on that driver's side rolled up window as dark enough that he could not see inside.

The Government introduced as its Exhibit 2c, what FBI TFO Det. Gumucio identified as a screen shot from his body camera video depicting Defendant's vehicle with the driver side door open with the window rolled down a little over halfway.  He described the tinting as dark enough that he could not see into the vehicle if it was rolled up all the way up.  The Government also introduced as its Exhibit 2d, what FBI TFO Det. Gumucio identified as a screen shot from his body camera video showing the tint of the driver's window a little under halfway rolled up, when he was closer to the vehicle than he was as depicted in Exhibit 2c

The Government introduced as its Exhibit 3,[6] what FBI TFO Det. Gumucio identified as the traffic citation from the City of Cleveland that was issued to Defendant by Detective Spahia with his unit, for window tint and a seat belt violation under the City of Cleveland code.[7]  Based upon his training and experience, as well as the Government's exhibits that were shown to him during the hearing on December 2, 2022, FBI TFO Det. Gumucio testified that the window tint on Defendant's vehicle was an impermissible amount, meaning in excess of 50 percent.

Upon being shown his own body camera video marked as Defendant's Exhibit D, FBI TFO Det. Gumucio acknowledged that he could "make out" the bottom half of the steering wheel of the Hyundai with his flashlight illuminating it, and that even if he could see the bottom half of the steering wheel, he could not see everything inside the vehicle.   He further explained that he was not going to comment on all the different types of lighting situations that you could see inside of a vehicle because there are so many variables between tint, the lighting on the outside of the street, the angle on which he is able to see the car, and things of that nature.  Upon being shown footage from Detective Donnellan's body camera video, marked as Defendant's Exhibit E, FBI TFO Det. Gumucio testified that the footage is from the vantage point of Detective Donnellan, and showed his flashlight and that of Detective Donnellan shining into the window, making it easier to see inside the driver's window.  When shown Defendant's Exhibit F, a still photograph of both the driver's side front and rear windows, FBI TFO  Det. Gumucio, with the two flashlights and street lighting illuminating the areas shown in the photograph and what appeared to be another detective's flashlight illuminating the passenger side of the vehicle, testified that he could see the

---

[6] The same traffic citation was marked as Exhibit B by Defendant.
[7] In the Government's First Supplemental Response, the Government asserts that it learned that Defendant pleaded guilty to the two traffic citations issued in conjunction with his arrest, prohibited window tint and seat belt violation. Specifically, the Government asserts that on March 16, 2021, Defendant entered guilty pleas to both citations, was found guilty, and paid all fines and costs in full that day, citing Cleveland Municipal Court, City of Cleveland v. Alfonso McDonald, Case Number, 2021TRD006330.  (Doc. No. 27, PageID # 190.)

passenger on the other side of the car and that she was wearing a black jacket and jeans, and the cup that had the marijuana in it.  He agreed that from Detective Donnellan's vantage point as shown in the photograph he could see into the vehicle, but from his own angle, FBI TFO Det. Gumucio testified that he could see through the open part of the driver's window, but he could not see everything in the front seat from his vantage point.  When asked to compare Government's Exhibit 2b with Defendant's Exhibit F, FBI TFO Det. Gumucio testified that Government's Exhibit 2b showed his perspective looking into the vehicle, which was a lot darker than the perspective of Detective Donnellan as shown in Defendant's Exhibit F.

FBI TFO  Det. Gumucio testified that Sergeant McGrath told him that as he was passing by in his elevated undercover truck from the north to south on West 73rd Street, he saw the driver move, i.e., he extended his arm or reached around to the back passenger side and placed something in the rear passenger area seat, but stated that the language he used in his report did not fully capture what Sergeant McGrath had told him.  FBI TFO Det. Gumucio testified that even with excessive window tint, he could still see silhouettes.  Based upon his training and experience, FBI TFO Det. Gumucio testified that in his opinion, the Hyundai's driver's door window was 60 to 70 percent tinted, and the back window was tinted 80 to 90 percent or more tinted.

At the reopened hearing, Detective James Donnellan was the sole witness called to testify. He is currently employed by the City of Cleveland Division of Police, as a detective with the gang impact unit that investigates crime throughout the city potentially linked to gang activity and conducts street-level narcotics and gun suppression enforcement.  On March 2, 2021, he believes he was working with Detectives Gumucio, O'Dea and Spahia, and they were concentrating their investigative efforts in the area of West 73rd Street, between Clark and Denison, because of

complaints of drug activity, violent crime and a gang that operates in that general area.  The Ridge Road Café was a spot that had given rise to consistent complaints.

Detective Donnellan testified that a Hyundai Sonata located directly in front of the Ridge Road Café became the object of the detectives' attention that night at about 11:00 p.m., based upon a report from a detective describing a hand-to-hand drug transaction.  Detective Donnellan testified that there were tinted windows on the vehicle which they observed a few minutes later.

A traffic stop of the Hyundai was initiated about 10 to 15 minutes later, and before contact was made with the occupants, Sergeant McGrath drove by it in an undercover vehicle and advised that the driver had reached back into the back seat area over the center console and into the back seat; he did not know what was placed there but had just seen a movement toward the back seat. The Government introduced its Exhibit 4, which Detective Donnellan identified as his body camera video that captured the traffic stop.  Detective Donnellan testified that it captured the Hyundai with its driver's window not rolled down all the way but only a little less than halfway, which in his training and experience, could mean that a person is trying to hide or conceal something that he does not want to be seen in the car.

Detective Donnellan saw a rolled blunt, a brown cigar sitting in plain view in the center console of the Hyundai.  Based upon his observations, and while FBI TFO Det. Gumucio was focusing his attention on the driver of the vehicle, Detective Donnellan made the decision to start searching the Hyundai.  He started at the driver's side; he opened the door and immediately or within a few seconds, saw in the driver's side doorhandle, a plastic bag containing a white substance he identified as cocaine or crack   When he saw the white substance or narcotics, he told FBI TFO Det. Gumucio to read the driver his rights.  The search of the entire vehicle occurred

afterward, and the firearm was located.  According to Detective Donnellan, the drugs found in the Hyundai were testified and tested positive for a controlled substance.

Detective Donnellan testified that he was riding along with FBI TFO Det. Gumucio and a decision was made to conduct the traffic stop based upon excessive window tint and the hand-to-hand transaction that was observed by the undercover detective.  Detective Donnellan testified that the Hyundai was kept under surveillance while it stopped at the Rite Aid Shop convenience store, but it was not stopped at that time.  Detective Donnellan, along with FBI TFO Det. Gumucio and perhaps another detective, were in a vehicle situated on Camden Avenue just east of West 73rd Street, facing westbound towards West 73rd Street, and watching the Hyundai while it was stopped at the store.  He saw the Hyundai leave the parking lot and turn onto West 73rd Street southbound. Then, the detectives' vehicle followed the Hyundai approximately 50 to 75 feet behind it, for approximately half to three-quarters of a mile before initiating the stop of the Hyundai before it got onto Denison Avenue.  There were gang impact unit vehicles that pulled in front of the Hyundai as well, per Detective Donnellan.

Detective Donnellan confirmed that Defendant's Exhibit F that was shown to him is a still shot from his body camera video which captured his first vantage point of Defendant that evening; and that Defendant's Exhibit E is his body camera video that was also shot from his vantage point. Detective Donnellan confirmed that a marijuana blunt and excessive window tint are not something, considered alone, for which he would arrest someone.  He also confirmed that at a traffic stop an officer has the right to ask a driver to step out of a vehicle for officer safety purposes, handcuff him, and briefly detain and question the driver outside of the car.  Detective Donnellan confirmed that Defendant was cooperative and did not resist officers in any way.

12

**The Parties' Arguments**

Defendant makes two separate and distinct arguments in support of his motion asking this Court to suppress the firearm found in his vehicle as a result of March 2, 2021 traffic stop and search of his vehicle.  First, Defendant argues that based upon the totality of the circumstances as presented, law enforcement lacked credible, probable cause to stop him.  Stated succinctly, Defendant asserts that FBI TFO Det. Gumucio created a pretextual reason or ruse to stop Defendant, i.e., excessive window tint, which reason is supported only by his testimony as distinguished from the "best evidence", i.e., use of a tint meter; and his opinion concerning the excessive window tint is contradicted or undermined by his testimony concerning what Sergeant McGrath reported, the exhibits that Defendant offered at the December 2, 2022 hearing, and Detective Donnellan's testimony during the April 11, 2022 reopened hearing.  Second, Defendant argues that law enforcement illegally searched his vehicle prior to his invalid arrest, without probable cause and without a recognized exception to the warrant requirement.   Generally, Defendant argues that because the excessive window tint and possession of a marijuana blunt could not give rise to an arrest, Detective Donnellan's search of Defendant's vehicle was unlawful. Stated differently, law enforcement's search of Defendant's vehicle incident to a citation only violated Defendant's Fourth Amendment rights.

The Government argues that the traffic stop of Defendant's vehicle for unlawful window tinting was legal, given FBI TFO Det. Gumucio's opinion testimony, based upon his training and experience, that the tint on Defendant's driver's window was excessive, and that FBI TFO Det. Gumucio was not required to use a tint meter to so opine or conclude for this Court to find that there was reasonable suspicion or probable cause to stop Defendant's vehicle.  The Government also argues that the smell or observation of marijuana constitutes probable cause for a warrantless

search of Defendant's car; and that the bases of the search were:  the hand-to-hand transaction outside a bar with numerous drug related complaints and arrests; the area of West 73rd Street and Clark Avenue is a high crime area; Detective McGrath reported observing a person reach into the backseat area of the Hyundai; Defendant did not roll his window down all the way but only part way; a marijuana blunt was in plain view to Detectives Gumucio and Donnellan; Defendant admitted he did not have a medical marijuana card prior to the search; there was a bottle of liquor in the vehicle although it was unknown if opened; and the finding of drugs in the driver's door handle console further provided probable cause to search the vehicle.  Given the totality of these circumstances, the Government submits, the search of the car was justified.

## Law and Analysis

### A. The Court concludes that FBI TFO Det. Gumucio had reasonable suspicion to initiate a traffic stop of Defendant's vehicle.

In *United States v. Shelton*, 817 F. App'x 217, 219 (6th Cir. 2020), the Sixth Circuit Court of Appeals explained in relevant part as follows:

> The Supreme Court has held that when a police officer has 'probable cause' to believe that a driver has violated traffic law, the officer may stop the driver without running afoul of the Fourth Amendment; this is true even if the officer is *actually* motivated by some other purpose, such as investigating an unrelated crime.  *Whren v. United States*, 517 U.S. 806, 810, 812, 116 S.Ct. 1769. 135 L.Ed.2d 89 (1996). And in the context of 'ongoing' traffic violations—like a blocked license plate or, more relevantly, an overly tinted window—we have held, and the parties agree, that the less demanding 'reasonable suspicion' standard applies.  *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008).  In turn, then, we have held that an officer reasonably suspects a window-tint violation if the officer is 'familiar[]' with their state's tint law and 'estimate[s] that [a] vehicle [is] tinted substantially darker than' that law permits.  *United States v. Shank*. 543 F3d 309, 313 (6th Cir. 2008) (affirming denial of motion to suppress); *see also United States v. Terrell*, 483 F. App'x 161, 164-65 (6th Cir. 2012) (same).

*United States v. Shelton*, 817 F. App'x at 219.  See also, *United States v. Jeffries*, 457 F. App'x 471, 477 (6th Cir. 2012).  But, see *United States v. Ross*, 847 F. App'x 316, 318 (6th Cir. 2021),

where the Sixth Circuit, quoting *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012), explained that "[i]n order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity."[8]

In *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008), the Sixth Circuit concluded that a traffic stop for unlawful window tinting does not run afoul of the Fourth Amendment where the officer has substantial experience enforcing this traffic regulation and is familiar with window tinting. *Shank* involved a traffic stop initiated in a high crime area known for its drug distribution activity and shootings by officers because they noticed what they believed were unusually darkened windows. The Court agreed with the district court's determination that the officers had a proper basis to initiate the traffic stop because of what they believed to be excessive window tint based upon their substantial prior experience enforcing this traffic regulation, familiarity with window tinting and their estimate that the vehicle was tinted substantially darker than permitted by law. Although after the stop the officer(s) confirmed by use of a tint meter that the window tint violated Michigan law, the Court did not indicate that the confirmation of the excessive window tint by a tint meter was considered in or was a prerequisite to its upholding of the district court's determination of reasonable suspicion to initiate the traffic stop.

In *United States v. Shelton*, 817 F. App'x 217, 219 (6th Cir. 2020), the Court concluded that "*Shank* decides this case[,]" explaining:

> Detective Tate testified, credibly, in the magistrate judge's view, that he has a decade worth of experience enforcing Tennessee's window-tint law, and that, based on that experience, he believed the car Shelton was riding in had windows tinted substantially below Tennessee standards. And, if that weren't enough, the positive

---

[8] In *Ross*, the Sixth Circuit found that the district court had erred in its written analysis in applying Ohio law, specifically O.R.C. § 4513.241, to the tint on a rear-side window or back window, and therefore never reached the issue of whether an "ongoing" civil infraction, i.e., excessive window tint, provided reasonable suspicion or probable cause to initiate the traffic stop. The Court did affirm the district court's conclusion that the officer's observance of the defendant committing a turn-signal violation, i.e., a completed violation, was sufficient to stop the vehicle, without elaborating on whether the standard was probable cause or reasonable suspicion.

field test [tint meter test] and Detective Parks's testimony confirmed the reasonableness of Detective Tate's suspicion.

*United States v. Shelton*, 817 F. App'x at 219.

Relying upon *Shank* and *Shelton*, the court in *United States v. Plump*, 553 F.Supp.3d 435 442 (S.D. Ohio 2021), applied the "less stringent" reasonable suspicion standard[9] to the ongoing traffic violation of excessive window tint, to conclude that the stop of the vehicle did not violate the Fourth Amendment, where the officer, who had 7 years of experience evaluating excessive window tint, familiarity with Ohio's window tint law and details provided in support, testified that when he saw the defendant's vehicle the excessively dark window tint obstructed his ability to see the driver inside of the vehicle.  The court rejected the defendant's argument that the failure to use a tint meter to establish a violation of the Ohio statute precluded a finding of reasonable suspicion, noting that the defendant had not cited any Ohio case that the use of a tint meter is required to establish the violation and therefore, reasonable suspicion to stop the car.

This Court, too, finds that the less stringent standard of reasonable suspicion applies to the traffic stop of Defendant's vehicle for the "ongoing" excessive tint window violation.  As an initial matter, the court finds that FBI TFO Det. Gumucio's testimony was credible, despite Defendant's arguments to the contrary.  First, Defendant argues that the traffic stop was just a pretext or ruse given the prior reported hand-to-hand transaction.  However, FBI TFO Det. Gumucio's actual subjective motivations in effectuating the traffic stop are irrelevant to the validity of the stop.

---

[9] In *Shank*, the Sixth Circuit, citing *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999) and *Terry v. Ohio*, 392 U.S. 1, 21, 88 St. Ct. 1868, 20 L.Ed.2d 889 (1968), explained that "[r]easonable suspicion is 'more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person … of criminal activity'" and "requires 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' an investigatory stop."  The Court further explained that it "'can arise from evidence that is less reliable than what might be required to show probable cause'."

*Shank*, 543 F.3d at 313citing *Whren v. United States*, 517 U.S. 806, 812-13, 116 S.Ct. 1769, 135 L.2d 89 (1996)).

Second, Defendant attempts to undermine FBI TFO Det. Gumucio's testimony by comparing it to Detective Donnellan's testimony, identifying lack of specifics in his report when considered with or compared to his testimony, and showing footage from Detective Donnellan's body camera.  However, what difference(s) in the two officers' testimonies concerning where on what specific street their vehicle was stopped off of West 73rd Street as Defendant's vehicle passed by on West 73rd Street in front of them and whether each could see the vehicle stopped at the convenience store is either:  (1) not really a difference because in reality FBI TFO Det. Gumucio testified he was not sure what street he had parked on facing West 73rd Street; or 2.) FBI TFO Det. Gumucio testified that he based his opinion that the driver's side window of the Hyundai had excessive window tint because he could not see the driver of the Hyundai at the very time that both officers testified it did pass the street on which the detectives' vehicle was stopped.  Also, Defendant's citation to Detective Donnellan's testimony concerning the rear window tint of Defendant's vehicle as it was followed on West 73rd Street and Defendant's demonstration of the different degree of tint between the driver's door window and the back window is of no moment because FBI TFO Det. Gumucio's testimony's was consistent and established that his basis for initiating the traffic stop was not the rear window tint or back window tint, but the fact that he could not see the driver through the driver's door window as the Hyundai passed in front of his vehicle as it sat facing West 73rd Street.

Moreover, the fact that in his report FBI TFO Det. Gumucio described what had occurred at the Ridge Road Café between the Hyundai and an individual that walked up to it as a "hand-to-hand transaction" but testified that there was a report of a "hand-to-hand **drug** transaction" does

17

not undermine his credibility.  Also, although FBI TFO Det. Gumucio acknowledged that his report about what Sargent McGrath advised him did not fully capture everything that was said, FBI TFO Det. Gumucio did not equivocate that Sergeant McGrath advised that he saw the driver of the Hyundai extend his arm to the back passenger side seat, and the firearm was located in the rear passenger seat pocket.  Finally, FBI TFO Det. Gumucio credibly testified that Sergeant McGrath's vantage point was from an elevated undercover truck, and despite the excessive window tint, would have allowed him to see silhouettes in the vehicle.

Finally, FBI TFO Det. Gumucio credibly explained that from Detective Donnellan's vantage point as shown in the photograph he could see into the vehicle, but from his own angle or vantage point, he could see through the open part of the driver's window, but he could not see everything in the front seat; and that from his vantage point or perspective, it was a lot darker looking into Defendant's vehicle.  Indeed, Defendant's Exhibits demonstrate that flashlights were being used by two if not three officers, and there was street lighting at the intersection of West 73rd Street and Denison Avenue, as they interacted with Defendant while he was seated in his vehicle with his window only part-way rolled down.

With ten years of experience evaluating excessive window tint, knowledge of and familiarity with the Ohio statute and City of Cleveland code regarding window tint, and his detailed testimony of what he could not see, specifically the driver, both from his vantage point as Defendant's vehicle passed his when stopped facing West 73rd Street, and when he approached Defendant's vehicle on the driver's side, FBI TFO Det. Gumucio  had reasonable suspicion to initiate the traffic stop.  Indeed, his knowledge of the reported hand-to-hand transaction involving Defendant's vehicle at the Ridge Road Café, an area known to him to involve gang activity, drug trafficking and guns, at 11:00 p.m., along with his knowledge that excessively tinted windows are

often used to impede law enforcement's ability to see individuals and items in a vehicle, served to provide FBI TFO Det. Gumucio reasonable suspicion, and even probable cause, to stop Defendant's vehicle.

While Defendant did develop testimony from FBI TFO Det. Gumucio that the best evidence of a violation of Ohio and the City of Cleveland's laws regarding window tint is a tint meter, Defendant has not cited any case law for the proposition that reasonable suspicion for a traffic stop cannot be shown unless a tint meter is used to confirm an officer's opinion, based upon his training and experience, that an excessive window tint violation has occurred.  However, the Government has cited authority from Ohio appellate courts, and the Eleventh Circuit Court of Appeals and the Ninth Circuit Court of Appeals, to support its argument that the use of a tint meter is not a prerequisite or requirement for effecting a traffic stop as long as the officer had a reasonable belief that a violation of the law had been committed.[10]  These cases constitute persuasive authority that confirmation of a window tint violation by use of a tint meter is not a prerequisite to finding that FBI TFO Det Gumucio had reasonable suspicion to initiate the traffic stop of Defendant's vehicle.

### B.  The Court finds that the search of Defendant's vehicle was based on probable cause under the totality of the circumstances.

Defendant is correct in asserting both that Detective Donnellan confirmed or acknowledged that both the window tint violation and the raw marijuana blunt in plain view in Defendant's vehicle are minor misdemeanors under Ohio law, and that neither would justify an arrest, citing Ohio Revised Code § 2935.26.  Defendant is also correct in asserting that Detective Donnellan testified that he did not believe Defendant was under arrest at the time he opened the driver's door

---

[10] *State v. Tarrance*, 11th Dist. No 2012-P-0073, 2013 WL 3367035 (Ohio App. June 28, 2013); *State v. Terry*, 2nd Dist. No. 18166, 2000 Ohio App. LEXIS 3145 (Ohio App. July 14, 2000); *United States v. David*, 815 F. App'x 370 (11th Cir. 2020); and *United States v. Parker*, 371 F. App'x 749 (9th Cir. 2010).

of Defendant's car and found the narcotics in the driver's door console.  Indeed, both FBI TFO Det. Gumucio's testimony and Detective Donnellan's testimony, as well as their respective body camera videos, demonstrate that Defendant was not arrested until Detective Donnellan notified FBI TFO Det. Gumucio that he had found something in the car.  However, the record demonstrates that Detective Donnellan did not open the driver's door of Defendant's vehicle simply incident to a citation, as Defendant argues.

Indeed, the Government correctly cites authority for its argument that an officer's observation of marijuana in an automobile can by itself establish probable cause for a search of the vehicle.  *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) (finding that the agent's smelling of marijuana constituted probable cause to believe that there was marijuana in the vehicle); *United States v. Foster*, 376 F.3d 577, 583-84 (6th Cir. 2004) (the fact that marijuana was smelled/detected in the defendant's vehicle provided the officers with probable cause to search the vehicle and whether it was burnt or fresh-smelling did not matter); *United States v. Johnson*, 707 F.3d 655, 568 (6th Cir. 2013) (citing *United States v. Bailey*, 407 F. App'x 27, 28-29 (6th Cir. 2011)(quoting *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002) to conclude that an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search).  The Government then argues that given the observation of marijuana in the console of Defendant's vehicle, along with other circumstances already noted above, law enforcement had probable cause to search Defendant's vehicle.

According to the Sixth Circuit, reasonable suspicion to perform a traffic stop may ripen into probable cause to search a vehicle based on the officer's interactions with the vehicle's occupants and under the automobile exception to the warrant requirement, an officer may perform a warrantless search of a detained vehicle should the officer have probable cause to believe the

vehicle contains contraband or evidence of criminal activity.  *United States v. Lyons*, 687 F.3d 754, 769-70 (6th Cir. 2012) (citations omitted.)  The automobile exception applies even in non-exigent circumstances and when the officer's decision to stop the vehicle was pretextual.  *Id.*

The record supports the following circumstances that when the Court views them in their totality, provided probable cause for the search of Defendant's vehicle: 1.) the hand-to-hand transaction at the Ridge Road Café, the subject of numerous drug-related complaints and arrests and located in the area of West 73rd Street and Clark Avenue, a high crime area involving reports of gang activity, drug trafficking and guns, at 11:00 p.m.; 2.) Sergeant McGrath's report of the driver, i.e., Defendant, reaching back over the passenger seat towards the rear seat; 3.)  Defendant not opening his driver's window all the way when asked; and 4.) FBI TFO Det. Gumucio's and Detective Donnellan's observations of a marijuana blunt in the center console of the Defendant's vehicle, along with Defendant's admission that he did not have a medical marijuana card.  And, once Detective Donnellan located the narcotics in the driver's door console of Defendant's vehicle, there was even more reason to search the vehicle, during which the firearm that is the subject of the indictment was found.

For the reasons set forth above, Defendant's Motion to Suppress is DENIED.

**IT IS SO ORDERED.**


 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  May 11, 2023                    U. S. DISTRICT JUDGE